UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------x
                              :
KENNETH OTTO,                 :
                              :
        Plaintiff,            :
                              :
    v.                        :   Case No. 3:10-CV-1512(AWT)
                              :
BRIAN MURPHY, SAYED NAQVI,    :
CARLTON WRIGHT, KATHY WEINER, :
and WENDY SANDERS.            :
                              :
        Defendants.           :
                              :
------------------------------x
```

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Kenneth Otto, who is currently incarcerated at Garner Correctional Institution in Newtown, Connecticut, commenced this civil rights action pro se and in forma pauperis against Commissioner of Correction Brian Murphy ("Murphy"), Dr. S. Johar Naqvi ("Dr. Naqvi"), Dr. Carson Wright ("Dr. Wright"), Nurse Kathy Weiner ("Weiner") and Nurse Wendy Sanders ("Sanders"). The plaintiff claims that the defendants were deliberately indifferent to his serious breathing condition. The defendants have moved for summary judgment. For the reasons set forth below, the motion for summary judgment is being granted in part and denied in part.

## I.   FACTUAL BACKGROUND[1]

On May 16, 2007, the plaintiff entered Hartford Correctional Center.  At the time, a medical staff member noted that the plaintiff had a history of two herniated discs, hypertension, an enlarged prostate and Chronic Obstructive Pulmonary Disease ("COPD") and that he had brought with him a Continuous Positive Airway Pressure ("CPAP") machine, which provides a positive flow of oxygen into the plaintiff's airways. The plaintiff explained that he used the CPAP machine at night to help him breath.  On May 17, 2007, a physician examined the plaintiff and noted that he suffered from COPD and that his oxygen saturation levels decreased below normal at night, which made it necessary to have supplemental oxygen.  Later that day, prison officials at Hartford Correctional Center transferred the plaintiff to Corrigan Correctional Institution ("Corrigan").

At Corrigan, medical staff noted that the plaintiff suffered from COPD and used an Oxygen Concentrator, which provides oxygen-enriched air in a concentrated form to the plaintiff, to treat that condition.  A physician noted that the plaintiff suffered from restless leg syndrome when he slept and

---

[1] The facts are taken from the defendants' Local Rule 56(a)1 Statement (Doc. No. 25-2), the defendants' affidavits and attached exhibits (Doc. Nos. 25-4 through 25-6) and (Doc. No. 33), plaintiff's Local Rule 56(a)2 Statement (Doc. No. 32) and plaintiff's Reply to the Answer (Doc. No. 22) and the attachments to the Complaint (Doc. No. 1).

took medication to treat the condition.  Medical staff permitted the plaintiff to keep and use an oxygen machine at night in his cell.

On June 4, 2007, prison officials at Corrigan transferred the plaintiff to MacDougall/Walker Correctional Institution ("MacDougall/Walker").  During the intake screening, medical and mental health staff noted that the plaintiff suffered from a number of medical conditions, including COPD, and that the plaintiff used an oxygen machine at night.  Medical staff provided the plaintiff with a pass to permit him to keep his oxygen machine in his cell indefinitely.

Dr. Naqvi was employed as a medical doctor at MacDougall/Walker from September 2003 to August 2011.  The plaintiff's medication records reflect that Dr. Naqvi regularly prescribed an Albuterol inhaler to treat the plaintiff's breathing problems.

On July 1, 2007, the plaintiff requested an extra pillow to help with his breathing problems.  Dr. Naqvi denied the request. On July 12, 2007, the plaintiff complained to a nurse about the fact that staff had taken his Advair when he arrived at MacDougall/Walker and that he was having trouble breathing at night.  The nurse noted that the plaintiff used his Albuterol inhaler twice a day, his lungs were clear, he was not short of breath, his respirations were even and unlabored and his oxygen

3

saturation level was 97%.  She obtained a medical release from the plaintiff and sent a request for the plaintiff's medical records to the plaintiff's former physician and Saint Francis Hospital.  She noted that she would refer the plaintiff to a physician as soon as the medical records were received.

In early August 2007, Dr. Naqvi prescribed Albuterol for the plaintiff's breathing condition to be used for two months. Dr. Naqvi renewed the prescription on October 1, 2007 for three months and again on December 20, 2007 for six months.  On June 12, 2008, another physician at MacDougall/Walker renewed the prescription for Albuterol for six months.  On December 1, 2008, Dr. Naqvi renewed the prescription for six months.

Dr. Naqvi examined the plaintiff on August 20, 2007 due to the plaintiff's complaints of seeing black spots.  He referred the plaintiff to an optometrist.  On December 27, 2007, a nurse obtained another medical release to obtain the plaintiff's medical records from Saint Francis Hospital.

Dr. Naqvi treated the plaintiff for warts on his hand in late 2007 and again in May and July 2008.  Dr. Naqvi prescribed medication to treat the plaintiff's complaints of urinary frequency in February 2008.  In May 2008, the plaintiff complained that the use of the oxygen machine was causing dry sinuses and occasional nose bleeds.  Dr. Naqvi prescribed a spray to treat the plaintiff's nasal dryness.  In November 2008,

4

medical staff treated the plaintiff for a sore throat and his complaints of shortness of breath.

On December 9, 2008, a jury in the Connecticut Superior Court for the Judicial District of Hartford found the plaintiff guilty of murder.  On December 20, 2008, a nurse reviewed the plaintiff's medical chart and noted that she had not observed the plaintiff using his oxygen machine on the many occasions she had handed out morning medications to the plaintiff and other inmates in his unit.  The nurse also noted that the plaintiff's chest x-ray of June 2007 was normal and that medical records regarding sleep studies done prior to his incarceration had been requested twice but had not been received.  She requested that a physician review the plaintiff's chart to determine whether he needed an oxygen machine and whether he suffered from asthma that required an Albuterol inhaler.

On January 5, 2009, Dr. Naqvi examined the plaintiff and noted that his vital signs were stable and his chest was clear. Dr. Naqvi noted that the plaintiff suffered from COPD and used an oxygen machine to breathe.  He ordered that the treatment for the plaintiff's COPD continue and prescribed a spray for plaintiff's nasal dryness.

On January 27, 2009, Dr. Naqvi examined the plaintiff pursuant to the request for a review of the plaintiff's medical conditions and treatment.  The genesis of that request was

prison officials becoming aware of the fact that the plaintiff was hiding contraband in his oxygen machine, specifically handcuff keys that had been removed from the key box inventory in the unit control center.[2]  It is undisputed that removal of the keys was a serious incident.  Dr. Naqvi's notes state that the examination revealed that the plaintiff's vital sounds were stable and that his chest sounded clear.  Dr. Naqvi's notes state that the plaintiff had not used his inhaler since the beginning of the month.  Dr. Naqvi opined that the plaintiff did not have a breathing problem and did not need either an Oxygen Concentrator or a CPAP machine.  Dr. Naqvi discontinued the plaintiff's use of an oxygen machine but instructed him to continue using his inhaler as prescribed until further evaluation.

Prison officials at MacDougall/Walker transferred the plaintiff to Northern Correctional Institution ("Northern") later on January 27, 2009.  During his intake exam, a nurse

---

[2] The plaintiff's statement at the hearing for administrative segregation was as follows:

I understand what happened.  On Friday, when they came, I tried to explain to Officer Novak that I don't know where the keys are.  My cellie threatened my life.  C/O Novak told me to slide the keys under the door and everything would be forgotten.  I kept telling him, I don't know where the keys are.  My cellie told me that if I said anything, that he would send someone to my family and pull a "Cheshire on them."  I knew the keys were in my cell.  I don't know what he did with the plate and ring.

Local Rule 56(b) Statement 6, Doc. No. 32.

noted that he suffered from COPD and that his oxygen saturation level was 96%.  The plaintiff denied any immediate health needs.

Dr. Wright examined the plaintiff on February 9, 2009 and noted that the plaintiff presented with a history of COPD.  The plaintiff related that he had also been diagnosed with bronchitis and emphysema and used an oxygen machine at night for his breathing problems.  Dr. Wright noted the plaintiff's lungs were clear with no signs of wheezing.  He ordered that the plaintiff undergo a chest x-ray to rule out COPD.  He also directed the nursing staff to monitor the plaintiff's oxygen saturation levels as well as the amount and rate at which air was being inhaled and exhaled from the plaintiff's lungs.

The plaintiff underwent a chest x-ray on February 13, 2009.  The x-ray revealed mild to moderate COPD with no evidence of infiltrate or failure.  On February 28, 2009, the plaintiff complained of shortness of breath and waking up at night out of breath.  Dr. Wright examined the plaintiff on March 18, 2009 and discussed the results of the chest x-ray.  The plaintiff informed Dr. Wright of sleep studies performed at Saint Francis Hospital prior to his incarceration.  Medical staff obtained a medical release from the plaintiff on March 20, 2009 and sent a request for the plaintiff's medical records to the plaintiff's former physician and Saint Francis Hospital.  On June 8, 2009, medical staff informed Dr. Wright that medical records from

Saint Francis Hospital had been received at Northern.  A second set of medical records was received on July 8, 2009.

On Dr. Wright examined the plaintiff on July 24, 2009 and noted that the plaintiff had undergone sleep studies and pulmonary function studies prior to his incarceration.  In addition, the plaintiff had been using an oxygen machine at MacDougall/Walker.  Dr. Wright noted that he would review the plaintiff's chart to investigate these facts.

On August 5, 2009, Dr. Wright examined the plaintiff and noted that he had a history of Nocturnal Hypoxemia but had been confined at Northern for many months without suffering any problems.  He noted that he would contact the plaintiff's former treating physician.  On August 25, 2009, the plaintiff complained of shortness of breath.  Dr. Wright examined the plaintiff, discussed the results of the February 2009 x-ray showing mild to moderate COPD and prescribed an Albuterol inhaler and an Aerobid inhaler, to be used by the plaintiff for six months.  He also indicated that he would call the plaintiff's former treating physician to discuss the plaintiff's prior pulmonary work-up.

On November 20, 2009, prison officials at Northern transferred the plaintiff back to MacDougall/Walker.  During his intake evaluation at MacDougall/Walker, the plaintiff reported that he suffered from Nocturnal Hypoxemia and had used an oxygen

8

machine at night during his prior confinement at
MacDougall/Walker but that prison officials had taken the
machine away months previously.  The plaintiff exhibited no
shortness of breath or signs of respiratory distress, and his
oxygen saturation level was 98%.

In December 2009, the plaintiff suffered multiple nose
bleeds necessitating his admission to the emergency room at the
University of Connecticut Health Center ("UCONN") on two
occasions.  The nose bleeds required cauterization on both
occasions.  In February 2010, the plaintiff underwent an
examination in the Otolaryngology Clinic at UCONN.  The
physicians diagnosed the plaintiff as suffering from epistaxis,
commonly called nose bleeds, and rhinitis.  The physician
recommended that he be treated with bacitracin and saline spray.

On December 15, 2009, Dr. Naqvi prescribed medications
including an Albuterol inhaler and an Aerobid inhaler, to be
used for four months.  In April 2010, Dr. Naqvi renewed the
prescription for an Aerobid inhaler.  In June 2010, Dr.
Omprakash Pillai discontinued the prescription for an Aerobid
inhaler and prescribed an Asmanex inhaler in its place, to be
used for a year.  In July 2010, the plaintiff complained of
breathing problems and that the Asmanex inhaler was not working.
Dr. Naqvi prescribed an Albuterol inhaler for three months.  In
August 2010, the plaintiff complained that he could not sleep

without his oxygen machine.  The nurse directed the plaintiff to continue to use his inhalers until a physician could examine him.

On September 19, 2010, Dr. Naqvi noted that the plaintiff no longer suffered nose bleeds.  The plaintiff complained that the Asmanex inhaler was not working as well as the Aerobid inhaler had worked to help him breathe.  Dr. Naqvi prescribed another medication to treat the plaintiff's asthma.

In November 2010, the plaintiff complained of waking up two or three times at night and having trouble breathing.  He also reported being sleepy during the day.  A physician's assistant at MacDougall/Walker referred the plaintiff for a sleep study. On November 23, 2010, the plaintiff underwent a sleep study at MacDougall/Walker.  On November 29, 2010, pursuant to Dr. Naqvi's recommendation, the plaintiff underwent a second sleep study at MacDougall/Walker.  On December 3, 2010, the Utilization Review Committee approved a request by Dr. Pillai for the plaintiff to undergo a sleep study at UCONN.  The results of the sleep study performed on December 20, 2010 at UCONN revealed that the plaintiff exhibited mild to moderate periodic limb movement disorder, but no significant sleep disordered breathing.  Despite these results, Department of Correction medical and custody officials have permitted the plaintiff to use an oxygen machine at night in his cell since

December 2010.  See Defs. Local Rule 56(a)1 Statement, Ex. 6,
Pl.'s Medical Records.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the
court determines that there are no genuine issues of as to any
material fact to be tried and that the facts as to which there
is no such genuine issue warrant judgment for the moving party
as a matter of law.  See Fed. R. Civ. P. 56(a); Celotex Corp. v.
Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential
Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  The
moving party bears the burden of demonstrating "the absence of a
genuine issue of material fact."  Adickes v. S.H. Kress & Co.,
398 U.S. 144, 157 (1970).

When deciding a motion for summary judgment, the court is
required to "construe all the evidence in the light most
favorable to the nonmoving party . . . and [to] draw all
inferences and resolve all ambiguities in that party's favor."
Topps Co., Inc. V. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d
Cir. 2008).  Nonetheless, the inferences drawn in favor of the
nonmovant must be supported by evidence.  See Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)("mere existence of
a scintilla of evidence in support of the [nonmovant's] position
will be insufficient; there must be evidence on which [a] jury
could reasonably find for the [nonmovant]"); Western World Ins.

Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (when summary judgment motion is supported by documentary evidence and sworn affidavits, the nonmoving party must do more than vaguely assert "the existence of some unspecified disputed material facts" or rely on "mere speculation or conjecture" as to the true nature of the facts) (internal quotation marks and citations omitted).  The court may not try issues of fact when ruling on a motion for summary judgment but must leave those issues to the jury.  See e.g., Anderson, 477 U.S. at 255; Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined...to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirements is that there be no genuine issue of material fact."  Anderson, 477 U.S. at 247-48. An issue is "genuine...if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248 (internal quotation marks omitted).  A material fact is one

12

that would "affect the outcome of the suit under the governing law." Id.  Only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  Immaterial or minor facts are insufficient to defeat a motion for summary judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1157 (2d Cir. 1990).

Where one party is proceeding pro se, the court reads the pro se party's papers liberally and interprets them to raise the strongest arguments suggested therein.  See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).  Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment.  See Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

**III. DISCUSSION**

The defendants argue that (1) the Eleventh Amendment bars any claims against them in their official capacities for money damages; (2) the plaintiff has failed to exhaust his administrative remedies as to his claims against Dr. Wright; (3) the plaintiff has failed to allege the personal involvement of Murphy, Sanders and Weiner in the alleged deliberate indifference to his medical needs; (4) the plaintiff fails to allege that they were deliberately indifferent to his serious medical needs; (5) the claims for declaratory and injunctive

relief are moot; and (6) they are shielded from liability by qualified immunity.

### A.   Official Capacity Claims for Money Damages

The defendants argue that any claims against them for money damages in their official capacities are barred by the Eleventh Amendment.  On November 19, 2010, the court dismissed all claims for money damages against the defendants in their official capacities.  See Initial Review Or., Doc. No. 5.  Thus, the motion for summary judgment on this ground is being denied as moot.

### B.   Exhaustion of Administrative Remedies

The defendants contend that the plaintiff has failed to exhaust his administrative remedies as to his claim against Dr. Wright because he did not appeal the denial of a Health Services Grievance by Sanders.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust "administrative remedies as are available" before bringing an "action...with respect to prison conditions."  The PLRA's exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).  "Further, as long as other forms of relief are obtainable through

administrative channels, the provision is applicable even to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings." Giano v. Goord, 380 F.3d 670, 676 (2d Cir. 2004) (citing Booth v. Churner, 532 U.S. 731 (2001)).  "[A] defendant has the burden of proof with respect to administrative defenses" and exhaustion of remedies is such a defense.  Lore v. City of Syracuse, 670 F.3d 127, 149 (2d Cir. 2012).  "The failure to exhaust available administrative remedies is an affirmative defense...[that] is waiveable."  Handberry v. Thompson, 446 F.3d 335, 342 (2d Cir. 2006) (quoting Johnson v. Testman, 380 F.3d 691, 695 (2d Cir. 2004)).

In reviewing a claim of failure to exhaust administrative remedies, the Second Circuit "suggest[s] that a three-part inquiry is appropriate where a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust administrative remedies as required by the PLRA."  Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004).  First, "[d]epending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact 'available' to the prisoner."  Id. (citing Abney v. McGinnis, 380 F.3d 663, 666 (2d Cir. 2004).  Second,

> [t]he court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it or

> whether the defendants' own actions inhibiting the inmate's
> exhaustion of remedies may estop one or more of the
> defendants from raising the plaintiff's failure to exhaust
> as a defense.

Id. (internal citations omitted).  Third, if the court finds

that administrative remedies were available to the plaintiff,

and that the defendants are not estopped and have not forfeited

their non-exhaustion defense, but that the plaintiff

nevertheless did not exhaust available remedies, the court

should consider whether "special circumstances" have been

plausibly alleged that justify "the prisoner's failure to comply

with administrative procedural requirements."  Id. (quoting

Giano, 380 F.3d at 676 (internal citation omitted)).

The administrative remedies for the Connecticut Department

of Correction pertaining to inmate health care issues are set

forth in Administrative Directive 8.9, entitled Health Services

Review.  Pursuant to the version of Administrative Directive 8.9

that was in effect in July 2009, an inmate seeking review of a

medical decision regarding the diagnosis or treatment or lack of

a diagnosis or treatment of a medical condition was required to

apply for a Health Services Review by filling out an Inmate

Administrative Remedy Form, CN 9602.  See Defs. Local Rule

56(a)1 Statement, Ex. 8.  The inmate was required to check the

box on the form labeled Diagnosis/Treatment and concisely

explain the nature of his dissatisfaction with the treatment

and/or diagnosis and place the completed form in the Health Services box.  The Health Services Review Coordinator had ten days from the receipt of the Inmate Administrative Remedy Form to contact the inmate to determine whether the complaint could be resolved informally.

If the complaint could not be resolved informally, the Health Services Review Coordinator was required to schedule a Health Services Review Appointment with a physician as soon as possible.  If, after the appointment with the inmate, the physician determined that the existing diagnosis and/or treatment was appropriate, the inmate was deemed to have exhausted his Health Services Review.  Within ten business days of the appointment, the physician was required to send the inmate a written decision indicating "No Further Action" in the disposition section of the Inmate Administrative Remedy Form. If the physician determined that a different diagnosis and/or treatment was appropriate, he or she could act on the new diagnosis and/or treatment or refer the case to the Utilization Review Committee for authorization to provide new or different treatment.

As to the first question, the court concludes that the Department of Correction provided administrative remedies to the plaintiff with regard to his claim of lack of treatment for his breathing problem.

As to the second question, the defendants asserted the affirmative defense of failure to exhaust administrative remedies in their answer to the complaint.  Thus, the defendants have not forfeited their right to assert this defense.

The third question the court must consider is whether, by their actions, the defendants inhibited the plaintiff from filing grievances and exhausting his administrative remedies.  See Ziemba v. Wezner, 366 F.3d 161, 163 (2d Cir. 2004).  The plaintiff does not assert that the defendants interfered with his ability to file grievances or participate in the grievance process.

The copy of the Inmate Administrative Remedy Form submitted by the plaintiff shows that the box indicating that he had exhausted his administrative remedies had been checked.  Sanders has submitted an affidavit and another copy of the grievance showing that the box had not been checked.  Sanders avers that she was the Health Services Review Coordinator in July 2009, she did not check the box after responding to the plaintiff's application for Health Services Review and that no one else within the Department of Correction had the authority to check the box.  In addition, the copy of the plaintiff's medical records submitted by the defendants in support of the motion for summary judgment includes a copy of the Health Services Review form without the boxed checked.  See Defs. Local Rule 56(a)1

Statement, Ex. 6 at 156.  It is apparent that there is a dispute as to whether the box indicating the completion of the administrative grievance/review process had been checked by Nurse Sanders or some other Department of Correction employee.

Furthermore, it is not clear from Administrative Directive 8.9(10) that the plaintiff would be on notice that he must appeal a denial of a request for a review of a medical decision. Administrative Directive 8.9 only seems to provide for appeal by the physician if the Utilization Review Committee denies the physician's recommendation for treatment.  See Defs. Local Rule 56(a)1 Statement, Ex. 8 at 3.

The court concludes that there is a genuine issue of material fact as to whether the plaintiff had exhausted his administrative remedies as to his claim against Dr. Wright prior to filing this action.  Thus, the defendants have not met their burden of demonstrating that they are entitled to judgment as a matter of law on this ground, and the motion for summary judgment on the ground that the plaintiff failed to exhaust his administrative remedies as to the claim against Dr. Wright is being denied.

**C.   Personal Involvement**

The plaintiff contends that he sent a letter to Murphy in May 2010 but Murphy failed to respond to the letter, that Nurse Weiner responded to his Inmate Request regarding his oxygen

machine on October 24, 2009 and that Nurse Sanders responded to many of his inmate requests regarding medical treatment. Defendants Murphy, Weiner and Sanders argue that the claims against them should be dismissed because the plaintiff has not alleged their personal involvement in the alleged deliberate indifference to his medical needs.

### 1.   Defendant Murphy

To recover money damages as to these defendants under section 1983, the plaintiff must show that these defendants were personally involved in the constitutional violation.  See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).  Defendant Murphy was a supervisory official.  He cannot be held liable under section 1983 solely for the acts of his subordinates.  See Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985).

The plaintiff may show supervisory liability by satisfying one or more of the following criteria: (1) the defendant actually and directly participated in the alleged unconstitutional acts; (2) the defendant failed to remedy a wrong after being informed of the wrong through a report or appeal; (3) the defendant created or approved a policy or custom that sanctioned objectionable conduct which rose to the level of a constitutional violation or allowed such a policy or custom to continue; (4) the defendant was grossly negligent in supervising the correctional officers who committed the constitutional

20

violation and (5) the defendant failed to take action in response to information regarding the occurrence of unconstitutional conduct.  See Colon v. Coughlin, 58 F.3d at 873 (citation omitted).  In addition, plaintiff must demonstrate an affirmative causal link between the inaction of the supervisory official and his injury.  See Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002).

In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court found that a supervisor can be held liable only "through the official's own individual actions."  Id. at 676.  This decision arguably casts doubt on the continued viability of some of the categories for supervisory liability.  The Second Circuit, however, has not revisited the criteria for supervisory liability following Iqbal.  See DeJesus v. Albright, No. 08 Civ. 5804, 2011 WL 814838, at *6 n.4 (S.D.N.Y. Mar. 9, 2011).

The plaintiff contends that on May 6, 2010, he sent a letter to Murphy regarding his Nocturnal Hypoxemia condition and need for an oxygen machine at night.  The plaintiff claims that Murphy did not respond to his letter.

The fact that a prisoner sent a letter or written request to a supervisory official does not establish the requisite personal involvement of the supervisory official.  See Rivera v. Fischer, 655 F. Supp. 2d 235 (W.D.N.Y. 2009) (quoting Candelaria v. Higley, No. 04-CV-277, 2008 WL 478408, at *2 (W.D.N.Y. Feb.

19, 2008) ("Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim.")).  Furthermore, "a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim."  Swift v. Tweddell, 582 F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008) (citing cases).  Thus, a supervisory official's mere receipt of a letter complaining about unconstitutional conduct is not enough to establish personal involvement on the part of the official.  See Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997) (prison official who received letter from inmate and forwarded it to subordinate for investigation and response was not personally involved in depriving inmate of constitutional right); Bumpus v. Canfield, 495 F. Supp. 2d 316, 322 (W.D.N.Y. 2007) (allegation that defendant did not respond to inmate's letters alleging lack of medical attention was not enough to establish defendant's personal involvement in alleged violations); Smart v. Goord, 441 F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006) (failure of supervisory prison official to take action in response to letters complaining of unconstitutional conduct is insufficient to demonstrate personal involvement).

The fact that defendant Murphy did not respond to the May 6, 2010 letter from the plaintiff is insufficient to demonstrate the personal involvement of this defendant in the alleged

22

deliberate indifference to the plaintiff's medical needs.  Thus, the motion for summary judgment is being granted as to the claim against defendant Murphy.

### 2.  Defendant Weiner

The plaintiff contends that Nurse Weiner exhibited deliberate indifference in her response to his October 21, 2009 Inmate Request.  A copy of the Inmate Request addressed to Weiner, including the response, is attached to the Complaint.

The form reflects that the plaintiff first thanked Weiner for her October 8, 2009 response to his prior Inmate Request.  The plaintiff then explained that he had been seen by Dr. Wright on numerous occasions and that Dr. Wright was aware of his breathing condition but had failed to contact his former physician or retrieve his medical records from the physician.  The plaintiff sought Nurse Weiner's assistance in resolving the issue of his use of an oxygen machine.  An unknown individual responded to the Inmate Request on October 24, 2009 and indicated that Dr. Wright would be contacting the physician who had treated the plaintiff prior to his incarceration.

Defendant Weiner has filed an affidavit in which she avers that she was on medical leave from October 21, 2009 to December 4, 2009.  See Defs. Local Rule 56(a)1 Statement, Ex. 5, Weiner Aff. ¶¶ 9-12.  Thus, she could not have responded to the plaintiff's request on October 24, 2009.  Prison officials at

23

Northern transferred the plaintiff to MacDougall/Walker on
November 20, 2009.  She retired from the Department of
Correction in January 2010.  The plaintiff has offered no
evidence to contradict Nurse Weiner's Affidavit.

The court concludes that the plaintiff has not produced
evidence that could establish that Weiner was deliberately
indifferent to the plaintiff's medical needs.  Thus, the motion
for summary judgment is being granted as to the claim against
Weiner.

### 3.    Defendant Sanders

The plaintiff contends that he sent multiple Inmate Request
Forms to Nurse Sanders and that she responded to some of the
requests.  The plaintiff also asserts that Sanders verbally
insulted him.

The defendants argue that mere receipt of letters or
grievances is insufficient to show that Sanders was personally
involved in the alleged unconstitutional conduct.  Sanders is
not a supervisor and did not simply receive the requests for
medical treatment; she responded to the requests.  The plaintiff
claims that her receipt and response to the requests
demonstrates her personal involvement in the alleged deliberate
indifference to his medical needs.  The claim of deliberate
indifference to medical needs is addressed in the next section
of this ruling.

It is well-settled that verbal harassment or remarks do not constitute a cognizable violation of an individual's federally or constitutionally protected rights.  See Beckles v. Bennett, 2008 WL 821827 (S.D.N.Y. 2008) (alleged threatening remarks that plaintiff was "getting no rec, only [defendant's] foot up [plaintiff's] behind" was insufficient to state § 1983 claim); Gill v. Hoadley, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003) ("mere allegations of verbal abuse do not rise to the level of a constitutional violation, and are not cognizable under 42 U.S.C. § 1983").

Accordingly, the plaintiff's claim that Sanders told him to be patient and to stop crying on one occasion does not state a claim for violation of his constitutional rights.

### D.  Deliberate Indifference to Medical Needs

The plaintiff claims that defendants Naqvi, Wright and Sanders were deliberately indifferent to his serious breathing condition, Nocturnal Hypoxemia.  The defendants assert that the plaintiff has failed to state a claim under the Eighth Amendment.

The Supreme Court has held that deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976).  To prevail on such a claim, a plaintiff must provide

evidence of sufficiently harmful acts or omissions and intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel.  See id. at 104-06.  Mere negligence will not support a § 1983 claim; "the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law."  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003).  Thus, "not every lapse in prison medical care will rise to the level of a constitutional violation," id.; rather, the conduct complained of must "shock the conscience" or constitute a "barbarous act."  McCloud v. Delaney, 677 F. Supp. 230, 232 (S.D.N.Y. 1988) (citing United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970)).

"The deliberate indifference standard embodies both an objective and a subjective prong."  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994), cert. denied sub nom. Foote v. Hathaway, 513 U.S. 1154 (1995).  First, the alleged deprivation must be, in objective terms, "sufficiently serious."  Wilson v. Seiter, 501 U.S. 294, 298 (1991); see Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (standard is met by "a condition of urgency, one that may produce death, degeneration, or extreme pain").  Second, as to the subjective prong, the defendant must have "a mental state equivalent to subjective recklessness," which "requires that the charged official act or fail to act

26

while actually aware of a substantial risk that serious inmate harm will result." Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 834, 836-37, 839-40 (1994)).  Thus, "a prison official's failure to alleviate a significant risk that he should have perceived but did not" constitutes deliberate indifference. Farmer, 511 U.S. at 834, 838.

"There is no settled, precise metric to guide the court in its estimation of the seriousness of a prisoner's medical condition." Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003). The Second Circuit has identified several factors, however, that are highly relevant to the inquiry into the seriousness of a medical condition.  "Factors that have been considered include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (citing McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992).).  In addition, where the denial of treatment causes plaintiff to suffer a permanent loss or life-long handicap, the medical need is considered serious. See Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000).

With regard to the subjective component, the prisoner must "prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle, 429 U.S. at 104. "Mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given in adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." Chance, 143 F.3d at 703. "Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim." Sonds v. St. Barnabas Hosp. Correctional Health Servs., 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citing Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986)).

Both the defendants and the plaintiff have presented evidence that in July 2006, the plaintiff underwent a sleep study at Saint Francis Hospital that revealed that he suffered from a condition called Nocturnal Hypoxemia, which is evidenced by persistently low oxygen saturation levels during sleep. The study also revealed that the plaintiff exhibited an elevated number of leg movements during sleep, also known as Periodic

Limb Movement Disorder.  See Defs. Local Rule 56(a)1 Statement,
Ex. 10; Pl.'s Reply to Answer, Doc. No. 22, Ex. 1.  A physician
recommended that the plaintiff be treated with oxygen at night,
at a rate of two liters per minute, for his Nocturnal Hypoxemia.
In July 2007, the physician again noted that the plaintiff
suffered from Nocturnal Hypoxemia and recommended that the
condition be treated with oxygen at night.

When the plaintiff arrived at Hartford Correctional Center
in May 2007, he brought his oxygen machine with him.  Department
of Correction officials and medical personnel at Hartford
Correctional Center, Corrigan and MacDougall/Walker permitted
the plaintiff to use the machine until January 27, 2009.

In early January 2009, Dr. Naqvi noted that the plaintiff
suffered from COPD, used an oxygen machine at night to help him
breath and recommended that the treatment for COPD continue.  On
January 27, 2009, Dr. Naqvi re-evaluated the plaintiff and
concluded that the plaintiff did not suffer from a breathing
problem and did not require an oxygen machine.  In February
2009, Dr. Wright noted that the plaintiff's chest x-ray revealed
mild to moderate COPD.  In August 2009, Dr. Wright noted that
the plaintiff suffered from a sleeping disorder called Nocturnal
Hypoxemia.

Thus, as to the objective prong of the Eighth Amendment
standard, the court concludes that the plaintiff has, at least,

created genuine issues of material fact as to whether he suffered from a serious medical condition, i.e., a breathing condition requiring the use of an oxygen machine at night, during his confinement at MacDougall/Walker and Northern from June 2007 to September 2010.

The defendants argue that Dr. Naqvi, Dr. Wright and Nurse Sanders were not deliberately indifferent to that need.

### 1.   Nurse Sanders

The plaintiff contends that Nurse Sanders was deliberately indifferent to his breathing condition because she responded to an Inmate Request Form addressed to Dr. Wright.  The Inmate Request Form explains that the plaintiff had used an oxygen machine for a condition called Nocturnal Hypoxemia during his confinement at Walker/MacDougall, but the machine was damaged before his transfer to Northern.  The request also noted that the sleep test results and letters from his treating physician should have been in his medical file.  Sanders responded that the plaintiff had been re-scheduled to see Dr. Wright on July 24, 2009.  She recommended that the plaintiff bring with him the documentation to which he had referred in the request for the appointment.  The plaintiff's medical records reflect that the plaintiff did see Dr. Wright on July 24, 2009.

In July 2009, the plaintiff applied for a Health Services Review regarding the lack of treatment for Nocturnal Hypoxemia.

He noted that the medical reports from his treating physician
had been sent to MacDougall/Walker in July 2007.  Sanders denied
the Health Services Review request on July 26, 2009 and noted
that the plaintiff had been seen by Dr. Wright on July 24, 2009
and Dr. Wright was following up.  The medical records for July
24, 2009 reflect that Dr. Wright noted that he would investigate
the plaintiff's alleged past diagnosis of a sleeping disorder
requiring use of an oxygen machine at night.

The responses by Sanders to requests for medical treatment
by the plaintiff support the conclusion that she did not
demonstrate deliberate indifference to the plaintiff's medical
needs, and the plaintiff has failed to create a genuine issue of
material fact as to whether she did not.  Sanders scheduled the
plaintiff to be seen by a physician at Northern, recommended
that the plaintiff discuss the diagnoses and treatment
prescribed by his treating physician during his appointment with
Dr. Wright and denied his Health Services Review request because
he had been seen two days earlier by a doctor who was following
up by investigating the plaintiff's medical history.

Therefore, the motion for summary judgment is being granted
as to the claim against Sanders.

### 2.  Dr. Wright

The oxygen machine the plaintiff had used during most of
his confinement at MacDougall/Walker was not sent to Northern

due Dr. Naqvi's January 27, 2009 order to discontinue the
plaintiff's use of the machine.  The plaintiff submitted an
Inmate Request in February 2009 complaining of difficulties
breathing at night and waking up gasping for air.  The plaintiff
was seen by a nurse on February 28, 2009, who referred the
plaintiff to Dr. Wright.

Dr. Wright examined the plaintiff in late July 2009 and
noted that the plaintiff had undergone sleep studies and
pulmonary function tests prior to his incarceration and that he
had used an oxygen machine at night at MacDougall/Walker.  He
indicated that he would further review the plaintiff's medical
file and investigate the plaintiff's alleged past diagnosis of a
sleeping disorder requiring use of an oxygen machine at night.

In early August 2009, Dr. Wright examined the plaintiff and
noted that he suffered from a sleeping disorder known as
Nocturnal Hypoxemia.  He also noted that the plaintiff had been
confined at Northern for many months and had not experienced any
breathing problems.  In late August 2009, Dr. Wright examined
the plaintiff due to his complaints of shortness of breath.  He
noted that the February 2009 chest x-ray reflected mild/moderate
COPD, that the plaintiff's lungs were clear and that his oxygen
saturation level was 98%.  He prescribed an Albuterol inhaler
and an Aerobid inhaler, to be used by the plaintiff for six
months.  He also indicated that he would call the plaintiff's

former physician to discuss the plaintiff's prior pulmonary work-up.

In late September 2009, the plaintiff was exposed to smoke inhalation.  The medical records reflect that his lungs were clear and the plaintiff was not in distress and had no complaints.  On November 20, 2009, prison officials at Northern transferred the plaintiff back to MacDougall/Walker.

Although Dr. Wright became aware in August 2009 that the plaintiff had been diagnosed with Nocturnal Hypoxemia, he noted that the plaintiff had not shown symptoms indicating he was suffering from this condition during his confinement at Northern.  Dr. Wright avers that the plaintiff did not complain about fatigue or daytime sleepiness when he examined him in August 2009 or at any time after that examination.  Thus, he concluded that the use of an oxygen machine at night was not medically indicated.

When the plaintiff arrived at Northern, Dr. Wright acknowledged his complaint that he suffered from COPD and sent him for a chest x-ray.  At the time, the plaintiff was using an inhaler to treat his COPD symptoms.  When he complained of daytime shortness of breath in August 2009, Dr. Wright prescribed inhalers.  When Dr. Wright became aware that the plaintiff had been diagnosed with Nocturnal Hypoxemia in the past, Dr. Wright did not prescribe the use of an oxygen machine

because of the absence of any symptoms at the time.  This
evidence could not support a finding of deliberate indifference
to the plaintiff's medical conditions.

Thus, the motion for summary judgment is being granted as
to the claim against Dr. Wright.

### 3.   Dr. Naqvi

The plaintiff was permitted to bring his oxygen machine
with him when prison officials transferred him to
MacDougall/Walker on June 4, 2007.  A nurse issued the plaintiff
a pass to use the machine indefinitely.  It is undisputed that
until January 27, 2009 medical personnel, including Dr. Naqvi,
permitted the plaintiff to keep and use the oxygen machine in
his cell in the evenings during his confinement at
MacDougall/Walker.

In late December 2008, a nurse at MacDougall/Walker noted
that the plaintiff did not appear to be using his oxygen machine
during the mornings when she handed out medication to inmates in
the plaintiff's housing unit.  She questioned whether the
plaintiff needed the oxygen concentrator and referred the
plaintiff's file to a physician for review.  It is undisputed,
however, that the plaintiff had been prescribed the oxygen
machine to be used at night, not during the day.  In any event,
the record reveals that the plaintiff was seen by Dr. Naqvi on
January 5, 2009, at which time no adverse action was taken with

34

respect to the plaintiff's being permitted to use an oxygen machine.

On January 27, 2009, Dr. Naqvi examined the plaintiff pursuant to a request for a medical review of the plaintiff's need for the oxygen machine.  This review came on the heels of the conclusion by prison officials that the plaintiff had hidden contraband in his oxygen machine.  During that examination, Dr. Naqvi determined that the plaintiff did not suffer from a breathing problem and did not require an oxygen machine.  Dr. Naqvi noted the plaintiff's lungs were clear, there was no evidence of wheezing and the plaintiff has last used his inhaler at the beginning of January.

In his affidavit, Dr. Naqvi states that if the plaintiff had required the use of an oxygen machine, he would have exhibited symptoms of fatigue or daytime sleepiness.  It is undisputed, however, that the plaintiff had therefore been permitted to use the oxygen machine at night during the entire time he was confined at MacDougall/Walker.  Thus, drawing inferences in the plaintiff's favor, it was not to be expected that the plaintiff would have exhibited such symptoms because he had been allowed to use the oxygen machine.  The plaintiff's treating physician had prescribed the nighttime use of an oxygen machine based on the results of the June 2006 sleep study.  Dr. Naqvi did not perform a sleep study on the plaintiff prior to

discontinuing the use of an oxygen machine at night.  Rather, despite the plaintiff's history of reporting breathing problems and being prescribed, and allowed to use, an oxygen machine at night both prior to and during all of his time in custody, and despite Dr. Naqvi's apparent attitude towards the plaintiff's condition and the plaintiff's use of an oxygen machine a mere three weeks earlier, Dr. Naqvi abruptly changed course 180 degrees upon being asked, on the heels of the discovery of contraband in the plaintiff's oxygen machine, to determine if the plaintiff's use of an oxygen machine was medically necessary.  Drawing all reasonable inferences in the plaintiff's favor, there are genuine issues of material fact as to whether Dr. Naqvi actually thought the plaintiff no longer needed to use the oxygen machine, and as to whether Dr. Naqvi disregarded the plaintiff's serious medical needs when he decided to discontinue the plaintiff's use of an oxygen machine.

Upon the plaintiff's return to MacDougall/Walker in November 2009, the plaintiff informed the intake nurse that he experienced breathing difficulties at night, had been diagnosed as suffering from Nocturnal Hypoxemia and required the use of an oxygen machine during the night while he slept.  In December 2009 and in July and August 2010, the plaintiff complained again of difficulty sleeping and needing oxygen at night.  Dr. Naqvi did not address these complaints.

The court concludes that there are genuine issues of material fact as to whether Dr. Naqvi was deliberately indifferent to the plaintiff's serious medical needs when he discontinued the plaintiff's use of an oxygen machine at night in January 2009, and when he did not authorize the use of one in November 2009 upon the plaintiff's return to MacDougall/Walker.

Thus, the motion for summary judgment is being denied as to the claim against Dr. Naqvi.

### E.   Injunctive Relief[3]

Defendant Naqvi argues that the plaintiff's request for injunctive relief should be dismissed as moot.  The plaintiff concedes that he underwent a sleep study in December 2010.  The plaintiff's medical records reflect that Department of Correction medical and custody officials have permitted him to use an oxygen machine in his cell at night since December 2010.

The court concludes the plaintiff's request for injunctive relief is moot.  See Martin-Trigona v. Shiff, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed").

---

[3] Because the court has granted summary judgment in their favor on all claims against defendants Murphy, Weiner, Sanders and Wright on other grounds, it need not consider this argument against those defendants.

Thus, the motion for summary judgment is being denied as to the request for injunctive relief.

### F.   Declaratory Relief[4]

The defendants' argument for summary judgment on the claim for declaratory relief is that the claim is "unwarranted" for reasons stated throughout the defendants' memorandum.  However, the court has concluded that genuine issues of material fact exist as to the plaintiff's Eighth Amendment claim against Dr. Naqvi.  Dr. Naqvi's cryptic statement does not meet his initial burden at the summary judgment stage with respect to the claim for declaratory relief.  "[T]he moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000), and it also must show that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  See Fed. R. Civ. P. 56(a).

Thus, the motion for summary judgment is being denied as to the request for declaratory relief against defendant Naqvi.

### G.   Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

---

[4] See supra Footnote 3.

known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The defendants

argue that Dr. Naqvi is entitled to qualified immunity on the

plaintiff's claim that he violated his Eighth Amendment rights.

The defendants argue that Dr. Naqvi discontinued the plaintiff's

use of an oxygen machine "after it became clear that the machine

was not medically necessary and that the plaintiff was not using

the machine for its intended purpose."  Mem. Law Supp. Defs.

Mot. Summ. J. 6, Doc. No. 25.  However, genuine issues of

material fact exist as to whether Dr. Naqvi was deliberately

indifferent to the plaintiff's serious medical needs when he

discontinued the plaintiff's use of an oxygen machine on January

27, 2009 and when he did not reauthorize use of one upon the

plaintiff's return to MacDougall/Walker.

The defendants appear to also argue that Dr. Naqvi is

entitled to qualified immunity based on the fact that an oxygen

machine is currently being made available to the plaintiff.

However, the claim which has survived summary judgment relates

to the two time periods referred to above.

Accordingly, defendant Naqvi has not demonstrated that he

is entitled to summary judgment on the ground of qualified

immunity, and the motion for summary judgment on this ground is

being denied.

**IV.   CONCLUSION**

Accordingly, Defendants' Motion for Summary Judgment (Doc. No. 25) is hereby GRANTED in part and DENIED in part.  It is being granted as to all claims against defendants Murphy, Weiner, Sanders and Wright and as to the claim for injunctive relief against defendant Naqvi, and is being denied as to defendant Naqvi in his individual capacity and in his official capacity to the extent that the plaintiff seeks declaratory relief against him.

It is so ordered.

Dated on this 25th day of March, 2013 at Hartford, Connecticut.

_____/s/_____<br>
Alvin W. Thompson<br>
United States District Judge